Estate of Edward L. Koepenick, Deceased, and Marie F. Koepenick, Surviving Wife v. Commissioner. E. L. Koepenick (now deceased) and Marie F. Koepenick, Surviving Wife v. Commissioner.
Estate of Koepenick v. Commissioner
Docket Nos. 107653, 109915.
United States Tax Court
1943 Tax Ct. Memo LEXIS 290; 2 T.C.M. (CCH) 143; T.C.M. (RIA) 43255; May 24, 1943
*290 Robert A. Littleton, Esq., and James D. Cushman, C.P.A., for the petitioners. E. L. Corbin, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined income tax deficiencies against the petitioners for the calendar years 1937, 1938 and 1939 in the respective amounts of $210.02, $1,556.44 and $2,057.66, and, by amended answer, claims that the deficiency for 1937 should be increased. The principal question presented is whether the petitioners realized a taxable profit as the result of a contract under which they acquired the capital stock of Fairfax Farms Dairy, Inc. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Those facts apearing hereinafter which are not from the stipulation are facts found from the evidence presented at the hearing. This proceeding was instituted by Marie F. Koepenick, a resident of Washington, D.C., for herself and the Estate of Edward L. Koepenick, her deceased husband. Their return for each of the years 1937, 1938 and 1939 was filed with the Collector of Internal Revenue for the District of Maryland. Edward L. Koepenick and James J. Ward were the owners of *291 all the stock of the Embassy Dairy, a Maryland corporation, having its principal place of business in Washington, D.C. Sefton Darr and Robert L. Dickson owned all of the capital stock of the Fairfax Farms Dairy, Inc., hereinafter referred to as Fairfax, a Delaware corporation, with its principal place of business also in Washington. The Fairfax stock consisted of 1,250 shares, on which Darr and Dickson owed $160,000, evidenced by their personal note drawn in favor of Harry L. Black, from whom they had purchased the stock. Black owned the land and the building in which Fairfax operated, and had leased the property to Fairfax. Black, Dickson and Darr and previously operated Fairfax. Ill feeling developed, and Dickson and Darr bought Black's stock. No money was paid Black by Darr and Dickson, only the $160,000 note being given. They were unable to make the initial payments on the note when due and could not sell the stock without permission of Black. Coleman C. Gore, of Leesburg, Virginia, a broker in milk, furnished Fairfax milk through contracts with farmers in Virginia and Maryland. He saw the necessity of getting new management and probably new capital into Fairfax and acted as *292 representative of Darr and Dickson in seeking a purchaser. It was his idea that one of Fairfax's competitors could take over Fairfax, operate it in conjunction with its business and make a success of it. He approached Embassy but found that that business had obligations which prevented it from purchasing Fairfax. During the negotiations, he learned that Ward and Koepenick were willing to invest $10,000 personally but did not wish to obligate themselves any further. As Gore's welfare was very much tied in with Fairfax, he continued negotiations between the parties. By the transmission of several writings, in letter form, the parties reached an agreement. Under the terms of the agreement, Ward and Koepenick were to pay $10,000 in cash to Darr and Dickson. Fairfax was (1) to execute its serial notes, as principal, to Darr and Dickson in the aggregate amount of $70,000, with Ward and Koepenick as surety endorsers; (2) to deliver to Darr and Dickson certain notes in the aggregate amount of $22,000, some of the notes having been issued by Darr and Dickson personally and some by third parties; (3) to acquire a deed from Black for the real property occupied by Fairfax and to obtain the cancellation *293 of the note Black held against Darr and Dickson in the amount of $160,000 by executing its serial notes as principal, to Black in the aggregate amount of $179,000, secured by a second deed of trust on the said property and with Ward and Koepenick as surety endorsers; and (4) to assume the payment of a first deed of trust note against the property in the amount of $21,000. Darr and Dickson were to surrender the Fairfax stock for reissuance to Ward and Koepenick. There was to be no contract between Ward and Koepenick and Darr and Dickson unless the agreement with Black for the purchase by Fairfax of the property occupied by it and cancellation of the $160,000 note of Darr and Dickson could be worked out. On November 11, 1937, an agreement was reached with Black for the purchase of the property and cancellation of the said note. An essential part of the consideration for the agreement with Black was the agreement for the acquisition of the Fairfax stock by Ward and Koepenick from Darr and Dickson. An escrow agreement was entered into between the parties and Gore, with whom Darr and Dickson deposited their Fairfax stock. Gore was to hold in escrow certain notes of Fairfax, endorsed by *294 Ward and Koepenick and payable to Darr and Dickson, for a period of six months pending the necessary adjustments for the consummation of the contracts. On December 1, 1937, the board of directors of Fairfax, consisting of Dickson, S. D. Schwartz and P. J. Schwartz, singly tendered their resignations, and those remaining in office elected successors until all three persons had resigned and their successors, among whom were Ward and Koepenick, became the constituted board of directors of the company. Thereupon, the new board of directors of Fairfax authorized the company to accept, ratify and carry out the terms of the above-described agreements. All of the parties contemplated that Fairfax would be a party to the ultimate agreements and would execute its notes provided for therein as principal; that Darr and Dickson would deliver up the stock they held in Fairfax for cancellation and reissuance to Ward and Koepenick; and that Black would transfer his real property to Fairfax and would cancel and deliver up to Darr and Dickson the note for $160,000 they had signed and delivered to him. Thereupon, Ward and Koepenick paid over to Darr and Dickson the amount of $10,000. Darr and Dickson *295 surrendered their 1,250 shares of capital stock, being all of the issued and outstanding shares of Fairfax, endorsed in blank. The shares of stock so surrendered were canceled and 1,250 new shares were issued to Ward and Koepenick, at a value fixed by the board of $10 per share. Fairfax duly issued its promissory note in the amount of $179,000, payable to Black, issued six notes in the aggregate amount of $70,499.97, payable to Darr and Dickson, and delivered them to Gore to hold under the provisions of the escrow agreement. Fairfax also assumed payment of the first trust on the property acquired from Black. At a special meeting of the directors of Fairfax held on May 25, 1938, it was resolved that a contract between Darr and Dickson, as parties of the first part, Ward and Koepenick, as parties of the second part, and Fairfax, as party of the third part, to be dated as of even date, be filed with and included as a part of the minutes of the meeting, and that Ward, as president, and Koepenick, as secretary, be authorized and directed in the name of the corporation to subscribe its name to the said contract and to do and perform any and all acts necessary in carrying out the terms *296 and conditions of the said agreement. On or about the same date, May 25, 1938, certain adjustments were made in the agreement as originally constituted. It was agreed that the full amount due and owing to Darr and Dickson was $70,000, that prior payments of $4,000 should be credited thereon, and new notes issued for the balance of $66,000. Darr and Dickson canceled and returned the six notes dated December 1, 1937, in the aggregate amount of $70,499.97, made by Fairfax and endorsed by Ward and Koepenick. The escrow agreement was canceled and provision was made that Darr and Dickson should pay any income tax deficiencies that might be determined against Fairfax for any period of time prior to November 30, 1937, from part of the notes held in escrow for that purpose. There is no evidence that any deficiencies in taxes existed or had accrued against Fairfax on or prior to November 30, 1937, or that any such deficiencies had been proposed or assessed, or that the statute of limitations fixed in such cases by law had not expired, or that any claim had been made against Fairfax on account of any indebtedness or liability of Fairfax on or prior to November 30, 1937. Black agreed to and *297 did accept the notes of Fairfax, endorsed by Ward and Koepenick and secured by deed of trust on property to be transferred to the said company. The aggregated amount of the said notes was $179,000, of which $80,000 was to be applied as full payment of the $160,000 note executed by Darr and Dickson to Black and the balance of $99,000, together with the assumption of the first mortgage on the said property in the amount of $21,000, was to be the consideration for the property transferred to the company by Black. The net capital worth of Fairfax as of November 30, 1937, was substantially $100,000, but after the company had executed the above-described notes and acquired the property from Black there was a deficit of substantially $40,000, excluding the value of good will, in its capital net worth account. The good will as of November 30, 1937, was of a reasonable value of $15,000. The fair market value of the capital stock of Fairfax as of November 30, 1937, and before the transactions heretofore described, did not exceed $80,000, and after the said agreements had been fully carried out and the stock reissued to Ward and Koepenick, its value did not exceed $12,500. In entering into *298 the transaction for the purchase of the Fairfax stock, Ward and Koepenick felt that substantial savings could be effected from the operation of Embassy and Fairfax under one management, particularly through the consolidation of the facilities of the two companies for the distribution of milk and other products. After the purchase of the Fairfax stock Ward and Koepenick owned all of the stock of both companies. Each corporation retained its separate entry, but under an agreement whereby the distribution of their products was consolidated much expense was eliminated. Opinion In determining the deficiencies herein the respondent concluded that one of the notes distributed by Fairfax to Darr and Dickson in 1937 and the payments in 1937 and 1938 on its notes to Darr and Dickson and to Black effected the payment of dividends to Ward and Koepenick, the theory of the determination apparently being that the distribution and payments were in satisfaction of the personal obligations of Ward and Koepenick. By amended answer in the proceeding at Docket No. 107653 covering the year 1937, the respondent now alleges that the obligations to Darr and Dickson and to Black were the personal obligations *299 of Ward and Koepenick but were assumed by Fairfax in 1937, thereby resulting in gain to Ward and Koepenick in that year in an amount equal to the obligations assumed. It was stated at the hearing that in the event the respondent should prevail under his amended answer, he would no longer make claim for the deficiencies for 1938 and 1939 involved in the second proceeding at Docket No. 109915. The claim of the respondent is in our opinion without merit. Ward and Koepenick never had in mind and never agreed to pay more than $10,000 for the Fairfax stock. The obligations around which the respondent attempts to build his case were at no time their obligations and it was never contemplated that they would be. To the contrary, it was agreed and understood that they were acquiring for the $10,000 paid by them the stock of a corporation the liabilities of which would include the note obligations to Darr and Dickson and to Black. Darr and Dickson were the owners of the Fairfax stock and subject to the rights of Black and the Fairfax creditors could deal with the corporation as they pleased. The requirement, as a condition to their sale of the Fairfax stock to Ward and Koepenick, that Fairfax *300 issue and distribute to them the notes above described and procure the cancellation of their $160,000 note held by Black as a part of the consideration for the issuance of the $179,000 note to Black did not enrich Ward and Koepenick in the least. The parties have stipulated that prior to the transaction Fairfax had a net worth, exclusive of good will, of substantially $100,000, while at the conclusion of the transaction its net worth, excluding good will, was a deficit of $40,000, and that prior to the transaction its 1,250 shares of stock outstanding had a value not in excess of $80,000, while at the conclusion of the transaction the net value of the stock did not exceed $12,500. It was the stock as it existed at the conclusion of the transaction which was acquired by Ward and Koepenick and it was Darr and Dickson, not Ward and Koepenick, who received distributions in the course of the transaction. Ward and Koepenick realized no gain on the purchase in 1937 and no distribution to them by Farfax was made in either 1937, 1938 or 1939, when it made payments on its obligations to Darr and Dickson and to Black. See and compare , *301 and . Decision will be entered under Rule 50.